Filed 10/5/21  Marriage of McKinney CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

|  |  |
|---|---|
| In re the Marriage of NANCY and BRYAN MCKINNEY. | |
| NANCY MCKINNEY, Appellant, v. BRYAN MCKINNEY, Respondent. | E072891 (Super.Ct.No. RID235645) OPINION |

APPEAL from the Superior Court of Riverside County.  Belinda A. Handy, Temporary Judge.  (Pursuant to Cal. Const., art. VI, § 21.)  Affirmed.

The Appellate Law Firm, Corey Evan Parker and Berangere Allen-Blaine for Appellant.

Law Offices of Lisa R. McCall, Lisa R. McCall and Erica Baca for Respondent.

1

Appellant Nancy McKinney (Wife) appeals from the dissolution of marriage from respondent Bryan McKinney (Husband). Wife and Husband were married in 1991. During the marriage, they purchased three homes. They purchased a home in Anaheim Hills (Anaheim Hills House) using money Wife had received from selling a home she owned prior to the marriage. They subsequently purchased a home on Rembrandt Avenue in Corona (Rembrandt House). They moved out of the Rembrandt House and leased it to Wife's daughter, and bought a third house in 2006, on Fawnskin Drive in Corona (Fawnskin House). Husband admitted in 2008 or 2009 that he was viewing pornography and having sex with prostitutes. Wife had Husband sign over his rights to the Rembrandt House to her and her daughter. Husband and Wife eventually separated and Wife filed for divorce. After a trial that took place for several days during 2017 and 2018, the trial court dissolved the marriage and separated their property.

Wife makes several claims on appeal: (1) the trial court erred by awarding attorney's fees and sanctions pursuant to Family Code section 271 against Wife for continuances of the trial date; (2) the trial court erred in calculating equalization payments; (3) the trial court should have found that the down payment she made on the Anaheim Hills House was her separate property because she earned it prior to the marriage; (4) the trial court erred by finding that Husband's agreement to transfer his interest in the Rembrandt House was made under duress and the terms of the trust on the house could not be changed;; and (6) the trial court erred by not awarding her attorney's fees and ordering her to pay Husband $1,950 in attorney fees.

2

**FACTUAL AND PROCEDURAL HISTORY**

A.  PRETRIAL FILINGS

The Petition for Dissolution of Marriage was filed by Wife on April 8, 2010.  The matter was continued for several years.

On August 3, 2015, Wife filed a trial brief.  Wife stated that they were married on June 2, 1991, and they had separated on March 1, 2010.  Wife was disabled and her gross monthly income was $2,149.  Husband was an engineer and made $11,000 each month.  They had no children and had not agreed on any issues.  Wife alleged she lived in the Rembrandt House, on which Husband had signed a quit claim deed to her in 2009.  Further, Husband had been living in the Fawnskin House, which went into foreclosure.  Wife alleged that she paid the down payment on the Fawnskin House with her separate property and wanted to equalize her loss in the home in the amount of $70,000.  Wife also listed an OCER retirement account, which she wanted awarded as her sole and separate property.  Wife also requested that Husband pay a portion of her attorney's fees and costs in the amount of $15,000.

Husband filed a trial brief on August 14, 2015.  He listed the date of separation as May 1, 2012.  When Husband signed the quitclaim deed to the Rembrandt House there was no equity and he believed that they were going to reconcile.  Further, they jointly agreed to have the Fawnskin House go into foreclosure.  He also sought his community share of her OCER pension.  Husband also alleged that each party should bear their own attorney's fees and costs.

3

Wife filed an amended trial brief on October 6, 2015.  She again contended that the date of separation was March 1, 2010.  Wife sought $5,000 each month in spousal support; to be awarded the Rembrandt House as her separate property; a payout from Husband's pension in the amount of $115,275; reimbursement of $50,000 for the Fawnskin House; and attorney's fees and costs in the amount of $35,000.  She provided that the Rembrandt House was valued at $425,000, and there was a $350,000 mortgage.  Wife also alleged she was permanently disabled.  She lived on disability retirement and spousal support.

Husband filed an amended trial brief and declaration on June 28, 2016.  He listed contested issues as spousal support; division of assets and debts; breach of fiduciary duty; and attorney's fees and costs.

B.    TRIAL[1]

The trial began on May 24, 2017.  Wife testified.[2]  Wife and Husband were married on June 2, 1991.  They separated on March 1, 2010.  Wife was 41 years old and

---

[1] We note that Wife has failed in her opening brief to provide a proper statement of facts with references to the trial.  Wife's citations to the record are to the civil case sheet or possibly to her trial brief.  "Citing points and authorities filed in the trial court is not appropriate support for factual assertions in a brief.  Points and authorities are not presented under penalty of perjury.  Matters set forth in points and authorities are not evidence." (*Alki Partners, LP v. DB Fund Services, LLC* (2016) 4 Cal.App.5th 574, 590.) " 'Statements of fact that are not supported by references to the record are disregarded by the reviewing court.' " (*McOwen v. Grossman* (2007) 153 Cal.App.4th 937, 947.)  We will disregard Wife's statement of facts.

[2] During Wife's testimony, the trial court threatened to hold her in contempt based on her disrespecting the attorneys and the court.  She also was not answering questions.

4

Husband was 23 years old when they married. Prior to marrying Husband, she lived in a home in Garden Grove. After she married Husband, she sold the home. They bought the Anaheim Hills House after they were married. Wife put down $45,000 from the proceeds of the sale of the Garden Grove home. Husband's name was on the title to the Anaheim Hills House. They sold the residence at a short sale in 1996 for less than it was worth. There was no money received from the sale.

Husband and Wife bought the Rembrandt House. Wife used a lump sum disability retirement check she had received to make the $19,000 down payment. Husband did not put any money down on the Rembrandt House but his name was on the loan. They lived together in the house until August 2008. They paid the mortgage together. Wife claimed Husband signed a quitclaim deed turning the Rembrandt House over to a living trust in favor of her and her daughter. Husband told Wife that he wanted her daughter to have the home. Wife's daughter, husband, and children lived in the Rembrandt House. Wife insisted all of the money that went into the Rembrandt House was hers and that Husband signed over the Rembrandt House before Wife was aware of his infidelity. Wife denied she told Husband that in order to save their marriage he had to sign over the Rembrandt House.

Wife and Husband moved to the Fawnskin House in either 2008 or 2009. They put $20,000 down on the Fawnskin house. Between 2008 and 2010, Wife and Husband separated and got back together several times. Husband had admitted to infidelity with prostitutes. He told her he had a pornography addiction. Wife told him he had to be treated for his sex addiction in order to stay with her.

5

Wife had several surgeries between 2008 and 2010. In 2009, Husband had moved out of the Fawnskin house. Wife had a mastectomy and Husband moved back in to help her. Husband moved out again, but moved back in April 2009 to help her with a second mastectomy. He stayed to help her until March 1, 2010.

Wife and Husband lived in and out of the Fawnskin House between 2011 and 2012. When Wife moved out, she left furniture and tools valuing $7,000 that she claimed she did not get back. They stopped paying the mortgage so they could get a loan modification. The house was worth less than was owed on the mortgage. Wife moved out of the Fawnskin House in April 2012. The Fawnskin House was foreclosed on in 2012. She lost $49,000 due to the foreclosure—which she claimed was money she had put in that she had from selling the Garden Grove house, but provided no documentation to support her claim. Wife moved back into the Rembrandt House in 2012 and had her daughter move out. Wife was still living in the Rembrandt House at the time of trial.

Wife estimated she lost $70,000 on the Anaheim Hills House. She insisted Husband had agreed to pay her $45,000 for the loss. Between the Anaheim Hills and Fawnskin Houses, she lost $94,000.

Wife had an OCER retirement fund through the County of Orange. She was on disability and it paid her approximately $1,500 to $2,000 each month. She started with Orange County in 1978 and became disabled in 1994. She received the disability payments during the marriage.

6

Husband also had an OCER retirement plan. Husband took out $115,000 in 2009 and gave it to Wife. Wife claimed the money was to be used to pay her back for the Anaheim Hills House, money she lost, and money for her grandsons' college. She believed he gave it to her because he felt guilty for sleeping with prostitutes.

The $115,000 was put in their joint account and then transferred to a bank account in Wife's and her daughter's names. She pulled out $50,000 to pay attorney's fees in February 2010. A few days later she pulled out another $50,000. Wife gave some of the money to her daughter for a fund for college for her grandsons. She spent between $70,000 to $95,000 of it on attorney's fees and $45,000 for repairs on the "home." She claimed to also have paid additional taxes with the money, which was the penalty for pulling the money out of the retirement account. Wife paid veterinarian bills for their dog. She insisted Husband gave her the money so they could work on staying together. It was a gift for his infidelity.

Wife estimated she had incurred $95,000 in attorney fees. She wanted to be paid for the entire amount by Husband. She was seeking $4,000 per month in spousal support.

Wife estimated that the Rembrandt House was valued at $498,000. There was approximately $140,000 equity in the house. Her expenses were between $8,432 and $8,667 each month. She had a monthly income of $5,969. She got loans, her boyfriend gave her money, and she sold jewelry to help pay her additional monthly expenses. She had been disabled and unable to work since 1994. Wife also testified she put the money from the sale of the Garden Grove home into a savings account.

Wife alleged that Husband used their credit cards to pay for hotels to meet prostitutes and to purchase pornography, and never paid on them, although Wife had no documentation to support this claim. There was an $8,000 balance on one credit card at the time of separation and $4,000 on another. She had provided her own health insurance since March 1, 2010.

Husband's parents testified they loaned money to Husband and Wife during their marriage in 2009 and 2010. Husband told them it was to pay off debts. Husband was still paying off the loan. There was no written loan agreement. Husband told his mother that Wife was requiring him to sign over the Rembrandt House in order to get back together with her.

Husband testified that he withdrew $147,989.16 from his retirement account in February 2010. After taxes, he received $115,000. The money was deposited in a joint account owned by Husband and Wife. All the money was transferred out of that account into an account owned solely by Wife; he did not transfer it. Wife did not have permission to remove the funds. Wife withdrew all of the funds from her sole account between February and March 2010.

As for the Anaheim Hills House, he did not recall if they purchased it before or after they were married. He contributed $5,000 but the funds for the down payment came from the sale of Wife's Garden Grove home. There was a short sale in 1996 and they received no funds from the sale. The Rembrandt House was purchased with a lump sum payment from Wife's disability, which was received during the marriage in 1994.

8

They lived in the Rembrandt House together for 10 years until approximately 2006. They rented the house to Wife's daughter and her husband. Wife and Husband moved to the Fawnskin House. It was foreclosed on in 2012. At the end of 2008, they starting having marital problems because he admitted to Wife that he was looking at pornography and having sex with prostitutes. Husband's infidelity started in 2005. Wife threatened to divorce him and made him move out. She let him move back in but made him follow her rules including constantly checking in with him from work and doing all the household chores. She made him sleep on the floor next to her bed, making him sleep deprived.

Husband was forced to write up promises in the middle of the night to Wife to save the marriage. He promised to give her his retirement and support her grandchildren. She finally made him move out in May 2010. He had to pay rent on an apartment. Wife had hit him on several occasions during 2010 and 2011, including hitting him in the head with her cane and hitting him in the groin to make up for his infidelity. He never reported these incidents to the police.

In March 2011, Husband moved back into the Fawnskin House to help Wife after she had surgery. She forced him to move out again in October 2011 but he moved back in December 2011 when Wife had another surgery. Wife made him go to a sexual addiction class. He stopped visiting prostitutes after the class.

Husband had told Wife about his infidelity in 2009. In early 2010, she told him he needed to withdraw the money from the retirement account. She told him that she needed to pay bills. He only recently discovered that she had withdrawn all of the $115,000 and

9

spent the money. He did not willingly give her the money. He wrote a promise to give to it her in the middle of the night but he only did so to save the marriage and she told him what to write. He was told he had to sign over the house to Wife and her daughter for punishment for his infidelity. Wife threatened to tell everyone at his work that he was sleeping with prostitutes, and that he could not see her grandchildren, with whom he was attached. Wife also told him to ask his parents to give them money, which resulted in the $35,000 loan that he was paying back. He admitted there was no written agreement for the loan.

Husband worked for the County of Orange between 1998 and 2006. In 2006, he moved jobs to the City of La Quinta. Husband paid spousal support starting in 2010 even though they lived together part of the time. They both agreed in 2010 to stop paying the mortgage on the Fawnskin House because it was worth less than they owed. He left the house in May 2012. Wife took everything from the house that she wanted.

As for equalization, Husband alleged Wife took $9,000 worth of belongings from the Fawnskin House and that he wanted half. Husband wanted half of the value of a Mercedes that she used. His car was only valued at $3,000. He paid two tax bills in the 2011 tax year that he wanted split. There were credit card balances and other bills that needed to be split. He paid on a recreational vehicle they had purchased during the marriage that he wanted to be divided. He bought her a diamond ring at her behest—to save the marriage—on which he still owed money. He also wanted her to share in paying back the loan from his parents.

As for Wife's disability retirement, he was not asking for any of it during her lifetime but wanted the community property in the survivorship pension. He wanted the $115,000 back that was from his retirement account because of her breach of fiduciary duty in taking it and wanted Wife to pay all of his attorney's fees. He also sought to have the transfer of the Rembrandt House to be rescinded because of duress. The house should be sold so he could get his portion.

Husband acknowledged that Wife owned the Garden Grove house prior to the marriage and received $180,000 when it sold. She used between $30,000 to $35,000 to put a down payment on the Anaheim Hills House. On August 8, 2009, she forced him to put in writing that he agreed to pay that back. This was after he confessed to the pornography but before he admitted to the prostitutes. He did not pay because he only agreed under duress. The break up caused him depression and anxiety. He had never been medically diagnosed with depression or anxiety but had seen a psychologist.

C.    ORAL ARGUMENT

Marital status was terminated effective May 25, 2017.

Oral argument on the division of property was heard on August 23, 2018. Wife's counsel argued that they were married in June 1991 and Wife was disabled in 1994. Wife was disabled and Husband was able to work. She was not responsible for the loans from Husband's parents. There was no duress when Husband signed over the Rembrandt House or when he gave Wife his pension money. Further Husband engaged in criminal conduct with a community property asset by having sex with prostitutes in his car.

11

Wife argued she paid $40,000 for the Anaheim Hills House out of the Garden Grove proceeds and saved the rest of the money. She argued that she had $300,000 from the sale of the Garden Grove property and that it was not transmuted to community property. She was entitled to the $300,000.

Husband argued there was a breach of Wife's fiduciary duty. Wife had not introduced one document into evidence to support her claims. Husband admitted that Wife put $35,000 down on the Anaheim Hills House that was her own money. However, the asset no longer existed because it was sold at a loss and the separate property was gone. There was no way to trace back the funds. The disability lump sum payment in 1994 used to buy the Rembrandt House was paid out during the marriage and was community property.

Husband argued he was treated extremely poorly after 2008 when he admitted infidelity and that Wife was violent. All the writings transferring property to Wife were executed under duress. He was subject to abuse between 2009 and 2012. Husband set forth the equalization payments.

In rebuttal, Wife argued that each party should have $6,314 each month and that spousal support should be based on that amount. All of Wife's money was from the sale of the Garden Grove house. Husband had failed to show duress. Wife should be able to keep the Rembrandt House, which was in her and her daughter's names.

D.    RULING

The trial court issued an oral ruling on October 25, 2018. The trial court fixed the date of separation as March 1, 2010. The trial court first addressed the split of assets and debts, including the credit cards and vehicles.

The trial court concluded the loan from Husband's parents was community property. As for the survivorship benefit for Wife's disability retirement, Husband would get 50 percent at her death. Wife would get 50 percent of Husband's pension from the City of La Quinta 2006 to 2010 but would also have to contribute to the cost of a professional QDRO calculation.

As for the Anaheim Hills House, there was nothing left to divide or give back. The trial court found, "I know that there was information about separate property was put into it, and therefore [Wife] should get some of the down payment back and that [Husband] maybe put a small amount, but there is no tracing here that I can trace it back to as there is no asset for me to divide. That home was lost in a short sale. There's no asset. It no longer exists. There is no money to give back to the parties on that."

For the Rembrandt House, the trial court concluded that the lump sum disability income used to purchase the house was community property. There was no evidence tracing that it was her sole property. There was no evidence that she bought it with her separate funds. Finally, there was nothing to divide on the Fawnskin House because of the foreclosure.

The trial court determined that the agreement by Husband to give Wife and her daughter the Rembrandt House was due to duress. Husband felt guilty for what he had

13

done and wanted to save the marriage. The trial court rescinded the transfer and found the Rembrandt House was community property. The title needed to be changed and Wife could buy out Husband within a reasonable time. The trial court awarded Wife permanent spousal support in the amount of $3,750 each month.

The parties were ordered to list the Rembrandt House for sale no later than February 1, 2019. The parties would each pay their own attorney's fees. The trial court then addressed the $115,000 withdrawn from Husband's retirement account and spent by Wife. The trial court found there was no evidence as to where the money was spent. The trial court found the money was intended to go to the community to pay debts and taxes. The trial court ruled the equitable resolution was to find that it was community property and award half to each party. Wife would pay back the money that she owned from the proceeds of the sale of the Rembrandt House. However, the trial court wanted to ensure Wife had enough money to live on and found she was entitled to at least $50,000 from the sale of the house regardless of how much she owed on her portion of the $115,000 debt. If Wife still owed money to Husband, the money could be taken out of spousal support up to $400.

The parties appeared again on December 6, 2018. Wife had new counsel. The trust for the Rembrandt House would be modified to put the house back in the names of Husband and Wife.

Judgment was entered on April 2, 2019. The judgment included the ruling that Wife must pay attorney's fees in the amount $975 and $2,000 in sanctions for seeking a continuance in the trial judge's absence, which will be discussed, *post*. The judgment

14

included the items to be paid by both parties. The judgment included the equalization payments, which included Wife's car, Husband's car, furniture and other household items, and the life insurance purchased by Husband.

The judgment included the survivorship interest of 50 percent for Husband in Wife's OCER pension. The $115,000 was community property. It memorialized the ruling on the three houses. It further ordered that if Wife owed money to Husband after the sale of Rembrandt house, it would be taken out of spousal support. It was signed by both parties and there were no objections. Further, a second order was filed that Wife must pay Husband $1,950 in attorney's fees, as will be discussed in further detail, *post*.

## DISCUSSION

The trial court issued an oral statement of decision. An oral statement of decision can be issued in lieu of a written statement pursuant to Code of Civil Procedure section 632 if agreed to by the parties. (*In re Marriage of Furie* (2017) 16 Cal.App.5th 816, 824.) Here, the trial court stated it would issue an oral statement and there was no objection from Wife.[3]

A.     FAMILY CODE SECTION 271 SANCTIONS

Wife contends the trial court erred by awarding $2,000 in sanctions and $975 in attorney's fees pursuant to Family Code section 271. Wife has failed to provide the

---

[3] In the reply brief, Wife claims she did not object to the oral statement or request a written statement because she was a *pro se* litigant. This assertion is false. Wife was represented by James M. Fones at the October 25, 2018 hearing.

15

proper record citations, or any legal argument or citation to proper authority to support her claim.

From what we can glean from the sparse record on this issue, the trial court in 2017, prior to the start of the trial on May 24, was upset that Wife had received a continuance while the trial judge was out. The parties appeared in the trial court on February 25, 2016. The trial court noted that Wife had repeatedly changed counsel and had numerous continuances. The trial court advised Wife that the case needed to move along. The trial court wanted the trial to proceed on July 6, 2016.

On November 4, 2016, the trial court admonished Wife that there would be no more continuances. On January 13, 2017, the trial court made a tentative order to grant sanctions and attorney fees because of the continuances. Apparently at some point, Wife had requested a continuance when the trial judge was out of town. She received several continuances. The trial date was moved to May 24, 2017.

Apparently, Husband filed a motion for sanctions order on May 24, 2017, pursuant to Family Code section 271, which the trial court trailed until the trial was complete. The request for order is not in the record. At the oral hearing after trial on October 25, 2018, the trial court addressed the request for order for sanctions filed by Husband. There was a request for sanctions and attorney's fees based on the multiple continuances of trial. The trial court explained that in November 2016, Wife hired new counsel but was advised that she was not going to get a continuance of the trial date, which was set for February 2017. While the trial judge was out (which dates the parties had previously been informed of) Wife filed an ex parte motion for continuance and it was granted by

16

another judge. The trial court found that Wife and her counsel took advantage of the trial judge being out.

The trial court ruled, "Now any judicial officer that's sitting here gets to use their own judgment and make any decision that they wanted to do. But I do believe that this was not properly explained to the judicial officer that was sitting here; that this Court was adamant that there had been multiple continuances in this case; and that we were to go forward, and therefore my tentative on the January date was to grant the attorney fees and the costs. [¶] It was approximately, I believe, three hours of attorney fees at $325 per hour. That would have been $975 for that attorney time that the parties would have had to come to court. The court would find that amount to be a reasonable amount for the attorney to have expended at that hearing and preparing any type of argument. [¶] There's also a request for $2,000 in sanctions regarding the taking advantage of. The Court does believe there was a taking advantage of that, and therefore sanctions are going to be awarded and I am going to grant the $2,000." Wife was to pay Husband $2,975.

Wife provides citations only to the ruling by the trial court and argues that the trial court abused its discretion by imputing the bad conduct of her attorney to her. Further, the trial court erred by awarding sanctions and attorney's fees because it imposed an unreasonable financial burden on her in violation of Family Code section 271.

"[Family Code] section 271, . . . provides in relevant part that 'the court may base an award of attorney's fees and costs on the extent to which the conduct of each party or attorney furthers or frustrates the policy of the law to promote settlement of litigation and, where possible, to reduce the cost of litigation by encouraging cooperation between

17

the parties and attorneys. An award of attorney's fees and costs pursuant to this section is in the nature of a sanction.' [Citation.] '[Family Code] Section 271, subdivision (a) authorizes sanctions to advance the policy of promoting settlement of litigation and encouraging cooperation of the litigants' and 'does not require any actual injury.' [Citation.] Litigants who flout that policy by engaging in conduct that increases litigation costs are subject to imposition of attorney fees and costs as a [Family Code] section 271 sanction." (*In re Marriage of Corona* (2009) 172 Cal.App.4th 1205, 1225, fn. omitted (*Corona*).) Family Code section 271, subdivision (c) provides "An award of attorney's fees and costs as a sanction pursuant to this section is payable only from the property or income of the party against whom the sanction is imposed, except that the award may be against the sanctioned party's share of the community property."

Sanctions are committed to the discretion of the trial court and "will be reversed on appeal only on a showing of abuse of that discretion." (*In re Marriage of Davenport* (2011) 194 Cal.App.4th 1507, 1524.) "[W]e may affirm the court's sanctions order on any ground supported by the record." (*Corona*, *supra*, 172 Cal.App.4th at p. 1225.)

Initially, as stated, Wife has not provided proper citations to the record to support that the trial court abused its discretion. She also appears to claim that she could not personally be sanctioned for the bad conduct of her attorney. However, she fails to provide any legal authority in support. "The absence of cogent legal argument or citation to authority allows this court to treat the contentions as waived." (*In re Marriage of Falcone & Fyke* (2008) 164 Cal.App.4th 814, 830 (*Falcone*); see also *People ex rel. Reisig v. Acuna* (2010) 182 Cal.App.4th 866, 879.)

18

In her reply brief, Wife insists her citation to *In re Marriage of Sullivan* (1984) 37 Cal.3d 762, 768 was proper legal authority as it is the leading case interpreting the intention and application of Family Code section 271. Such contention is incorrect. *Sullivan* involves the award of attorney's fees pursuant to Civil Code section 4370 and makes no mention of Family Code section 271. (*Sullivan*, at pp. 768-769.) Wife has waived her claim that the trial court abused its discretion by awarding attorney's fees and sanctions pursuant to Family Code section 271.

Even if we were to consider Wife's argument that this was an unreasonable financial burden because she only made $24,000 each year from disability, we would reject the claim. "While the court must take into consideration all evidence concerning the parties' incomes, assets and liabilities, the only stricture imposed by [Family Code] section 271 is that the sanction may not impose "an unreasonable financial burden" on the party sanctioned.' " (*Corona*, *supra*, 172 Cal.App.4th at p. 1226.) Wife's argument completely ignores the record in this case, which showed that she had interest in the Rembrandt House and other assets including the $115,000 of Husband's pension that she spent.[4] The record does not support that the sanction and attorney's fees imposed an undue financial burden. The trial court did not abuse its discretion by awarding sanctions to be paid by Wife to Husband.

---

[4] In her appellant's reply brief, Wife claims that she only received $19, 211.77 in escrow for the sale of the Rembrandt House, without citation to any part of the record. We cannot accept this statement without support in the record.

## B.    EQUALIZATION

Wife contends the trial court erred in its determination of the award of equalization payments. Wife fails to cite to the record to support her claim. Wife lists the equalization payments but fails to cite to the record. She states that the trial court ordered she would receive $50,000 from the sale of the home but it assumed the house would sell for $200,000, which was not determined. She fails to provide any citation to the record to support her claim. This claim is waived. (*Falcone*, *supra*, 164 Cal.App.4th at p. 830.)

Wife additionally fails to cite to any pertinent legal authority or make any argument supported by legal authority. Wife only cites to Family Code section 2550, which states, "Except upon the written agreement of the parties, or on oral stipulation of the parties in open court, or as otherwise provided in this division, in a proceeding for dissolution of marriage or for legal separation of the parties, the court shall, either in its judgment of dissolution of the marriage, in its judgment of legal separation of the parties, or at a later time if it expressly reserves jurisdiction to make such a property division, divide the community estate of the parties equally."

The trial court followed the directives of Family Code section 2550 and divided the community estate of the parties equally. In fact, Wife does not argue that it was not equally distributed, but rather speculates that the Rembrandt House will not sell for the priced determined by the trial court. This is pure speculation and does not support her claim that the trial court abused its discretion in dividing the community property.

20

Moreover, as this court has set forth *ante*, the trial court ordered that Wife was to receive $50,000 from the sale of the home regardless of the amount that the house was sold for. She would be able to pay the remainder of her debt through a deduction from the monthly spousal support payments. The trial court's order considered the eventual sale of the Rembrandt House and made sure she would have enough funds to take care of herself.

C.   SEPARATE PROPERTY FOR DOWN PAYMENT ON ANAHEIM HILLS HOUSE

Wife contends the trial court erred by refusing to award her $30,000 as her separate property for the down payment on the Anaheim Hills House.

Wife provides two citations to the record to support her claim. However, the pages cited do not contain evidence regarding the down payment on the Anaheim Hills House. Moreover, we have not considered the statement of facts contained in Wife's opening brief as it fails to properly cite to the trial evidence. Again, the failure to properly cite to the record waives the claim on appeal. (*Falcone*, *supra*, 164 Cal.App.4th at p. 830.)

Even if we were to consider the claim, the trial court determined that the property on which she put the down payment was no longer in existence because of the short sale, which resulted in no money being taken out of the Anaheim Hills house. "[Family Code s]ection 2640 provides a limited reimbursement of separate property contributions as part of the division of the community estate under the Family Code. Contributions to the acquisition of community property are reimbursed to the extent a party traces the

21

contributions to a separate property source, unless the party waived the reimbursement right in writing or signed a writing that has the effect of a waiver. [Citation.] The amount reimbursed does not include interest or appreciation, *and cannot exceed the net value of the property at the time of division*." (*In re Marriage of Bonvino* (2015) 241 Cal.App.4th 1411, 1431-1432, italics added, fn. omitted.) Based on Family Code section 2640, the amount of reimbursement for the down payment on the Anaheim Hills House could not exceed the net value of the property at the time of the division. Here, the net value of the Anaheim Hills House was zero. Moreover, it could not be traced to the purchase of other property as no money was taken out of the Anaheim Hills House. (See *In re Marriage of Walrath* (1998) 17 Cal.4th 907, 918 ["We conclude that the phrase 'the property' in section 2640 includes not only the specific community property to which the separate property was originally contributed, but also any other community property that is subsequently acquired from the proceeds of the initial property, and to which the separate property contribution can be traced"].) Wife made no attempt to trace the separate property to show it was used to purchase additional community property. Moreover, no such tracing could be realized based on the short sale of the Anaheim Hills House, which resulted in no money being taken out of the property. Wife provides no other authority to support she is entitled to the money.

The trial court did not abuse its discretion by determining that wife was not entitled to reimbursement for the down payment on the Anaheim Hills House.

22

D.    REMBRANDT HOUSE TRANSFER

Wife contends the trial court erred by crediting Husband's testimony that he signed over his rights in the Rembrandt House under duress.  Wife insists the evidence does not support his testimony.  In addition, she claims that the trial court erred by ordering a change to the trust on the Rembrandt House based on the determination that the title to the home should return to Husband and Wife.

Again, Wife has failed to properly cite to the record to support her claim.  The citations to the record (RT 106-107) do not refer to the written agreement signed by Husband to transfer the Rembrandt House.  There is no citation to the record of Husband's testimony or the trial court's ruling.  Further, we have disregarded the statement of facts in the opening brief.  "Rather than scour the record unguided, we may decide that the appellant has waived a point urged on appeal when it is not supported by accurate citations to the record."  (*City of Santa Maria v. Adam* (2012) 211 Cal.App.4th 266, 287.)  Wife has waived her claim on appeal.

Moreover, even if we were to consider the claim, it lacks merit.  "Both duress and fraud are statutory grounds for attacking the validity of a contract."  (*In re Marriage of Baltins* (1989) 212 Cal.App.3d 66, 83.)  "Under the modern rule, ' " [d]uress, which includes whatever destroys one's free agency and constrains [him] to do what is against [his] will, may be exercised by threats, importunity or any species of mental coercion [citation]. . . .' " [Citation.]  It is shown where a party 'intentionally used threats or pressure to induce action or nonaction to the other party's detriment.  [Citation.]' [Citation.]  The coercion must induce the assent of the coerced party, who has no

23

reasonable alternative to succumbing. [Citation.] [¶] To determine whether a contract (or a default judgment) was the product of duress, the courts look not so much to the nature of the threats, but to their effect on the state of the threatened person's mind." (*Id.* at p. 84.)

The trial court heard the evidence from Husband about duress. Husband complained that he was sleep deprived. The agreement to transfer the house was an effort to save the marriage and he felt he had no choice. The agreement clearly disadvantaged Husband as he would have no interest in the community property asset. The trial court determined that the agreement by Husband to give Wife and her daughter the Rembrandt House was due to duress. Husband felt guilty for what he had done and wanted to save the marriage. The trial court rescinded the transfer and found the Rembrandt House was community property. The title on the house would need to be changed.

The trial court's determination that Husband was under duress in signing over the Rembrandt House to Wife is supported by the evidence and we will not disturb the determination on appeal. As such, the trial court also properly ordered that the title to the Rembrandt House be changed.

E.     SURVIVORSHIP BENEFITS

Wife insists that Husband was only entitled to 50 percent survivorship benefits for her OCER pension for the time period of 1991 to 1994, rather than for the entire time she was employed by Orange County. We will not review this claim. Wife fails to cite to the record supporting the miscalculation by the trial court. Further, she cites no legal

24

authority to support that Husband was only entitled to 50 percent. "The absence of cogent legal argument or citation to authority allows this court to treat the contentions as waived." (*Falcone*, *supra*, 164 Cal.App.4th at p. 830.)[5] The claim is waived on appeal.

F.    ATTORNEY'S FEES

Wife claims the trial court erred by refusing to award her attorney's fees in the case. She additionally claims she should not have been ordered to pay $1,950 in attorney fees. Once again Wife fails to adequately cite to the record to support her claim. As such, the claim is waived. (*Falcone*, *supra*, 164 Cal.App.4th at p. 830.)

Even if we were to consider the claim, we would reject the claim. Wife does not provide under what statute she was entitled to attorney's fees, but we presume it is pursuant to Family Code sections 2030 and 2032. "Family Code section 2030 permits the trial court to order payment of attorney fees and costs as between the parties based upon their 'ability to pay' and their 'respective incomes and needs' in order to 'ensure that each party has access to legal representation to preserve all of the party's rights.' [Citation.] 'The purpose of such an award is to provide one of the parties, if necessary, with an amount adequate to properly litigate the controversy.' [Citation.] The trial court may award attorney fees under section 2030 'where the making of the award, and the amount of the award, are just and reasonable under relative circumstances of the respective parties.' [Citation.]." (*In re Marriage of Rosen* (2002) 105 Cal.App.4th 808,

---

[5] In her reply brief, Wife for the first time cites to legal authority but we will not consider this authority. "[P]oints raised for the first time in a reply brief on appeal will not be considered." (*Nordstrom Com. Cases* (2010) 186 Cal.App.4th 576, 583.)

25

829.)  An award of attorney's fees under Family Code section 2030 is reviewed for abuse of discretion, and we therefore must affirm unless no judge reasonably could make the order.  (*Ibid*.)

The trial court in its ruling stated that Wife was seeking $80,000 and Husband was asking for $48,000 for attorney's fees.  The trial court found that they were both responsible for delays in the case and for the complications in the case.  They were each to bear their own attorney's fees.  The trial court properly determined that each should pay their own attorney's fees.  Such determination was not an abuse of its discretion, especially in light of the trial court equalizing the assets of the parties.

As for the $1,950 that Wife was ordered to pay, the trial court imposed the amount at a hearing on December 6, 2018, based on Husband's request for an order.  There were problems with Wife not paying the mortgage on the Rembrandt House and she had not signed documents that had been ordered by the court.  The trial court stated, "The Court has ordered that [Wife] is going to be paying $1,950 in attorney's fees to [Husband] for having to file this RFO and appear at court.  And this $1,950 in attorney's fees is to come out of . . . proceeds from the sale of the Rembrandt House."  The trial court explained that its order was clear at the prior hearing what Wife needed to do and the hearing was unnecessary and caused by Wife.  She had to pay the fees.

Such determination by the trial court was not an abuse of discretion.  The trial court confirmed that she would have the funds to pay the fees out of the proceeds to the Rembrandt House.  Wife only contends that she was on a fixed income and disabled but

this ignores the fact that she was awarded spousal support in the amount of $3,750 each month and other assets.  We reject her claim.

## DISPOSITION

The judgment is affirmed in full.  The parties are to bear their own costs on appeal.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS


MILLER
_____
Acting P. J.


We concur:


RAMIREZ
_____
P. J.


CODRINGTON
_____
J.

27